## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

              Plaintiff(s),

    v.

CARLOS LOMELI and
MANUEL HERNANDEZ,

              Defendant(s).

        8:10-cr-00158-LES-FG3

        FINDINGS AND
        RECOMMENDATION

      This matter is before the court on motions to suppress evidence (Doc. 142 & Doc. 158) filed by Carlos Lomeli and Manuel Hernandez.  The defendants both contest the legality of an order entered October 22, 2009 authorizing the interception of certain wire communications (the "Nebraska Wiretap") by the Drug Enforcement Administration ("DEA") for use in an ongoing narcotics investigation. The defendants allege that their telephone conversations were unlawfully intercepted, in violation the Fourth Amendment to the United States Constitution and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 ("Title III").  Lomeli also challenges a search warrant for his residence issued by the Douglas County Court on February 24, 2010.

      An evidentiary hearing was held November 8, 2010.  The hearing transcript (Doc. 184) was filed on November 15, 2010, at which time the motions were deemed submitted for decision.

      I recommend that evidence derived from the Nebraska Wiretap be suppressed because the application did not comply with the statutory requirements of Title III.

# I. FACTUAL BACKGROUND

## A.    The Nebraska Wiretap Application

On October 22, 2009, an Assistant United States Attorney (AUSA) for the District of
Nebraska submitted an application for interception of wire communications to a judge of this
court.  The application (Ex. 2) states:

> Pursuant to Section 2516 of Title 18, United States Code, the Attorney General
> of the United States has specially designated the appropriate officials of the
> Criminal Division to exercise the power conferred on the Attorney General by
> Section 2516 of Title 18, United States Code, to authorize this Application, under
> the power designated to him by special designation of the Attorney General
> pursuant to Order Number 3055-2009 of February 26, 2009, and an appropriate
> official of the Criminal Division, has authorized this Application.  ***Attached to
> this Application are copies of the Attorney General's order of Special
> Designation and the Memorandum of Authorization approving this
> Application.***

Ex. 1 at ¶ 3 (emphasis added).  There is no order of Special Designation or Memorandum of
Authorization attached to the copy of the application (Ex. 1) that was received in evidence at the
suppression hearing.

DEA Special Agent Quinn Auten provided a lengthy affidavit (Ex. 2 at p. 10) in support
of the wiretap application (Ex. 2).  Auten testified he has been conducting narcotics
investigations in the DEA's Omaha District Office since 2005.  In this instance, the
communications to be intercepted involved offenses enumerated in 18 U.S.C. § 2516, i.e.,
possession with intent to distribute and distribution of methamphetamine, in violation of 21
U.S.C. § 841(a)(1); unlawful use of a communication facility to facilitate these violations, in
violation of 21 U.S.C. § 843(b); and conspiracy to commit these offenses in violation of 21
U.S.C. § 846.

The affidavit describes information Auten acquired through training and experience, e.g., methods in which narcotics traffickers conduct business, processing methamphetamine for sale, how methamphetamine is distributed in the United States, and the use of telephones in drug trafficking.  In this particular investigation, law enforcement thought the methamphetamine was being shipped from Arizona to Nebraska either directly or via trans-shipment points in Colorado or Kansas.  They believed that conspirators in Nebraska distributed methamphetamine locally and also facilitated the transport of illicit drugs and drug proceeds through Nebraska and into surrounding states.

The target telephone is described in the application as a cellular telephone assigned number (402) 504-8583 with a  push-to-talk (i.e., walkie-talkie) feature assigned Urban Fleet Mobile Identifier (UFMI) number 103*323*8397 and International Mobile Subscriber Identifier (IMSI) 316010115508389.  According to records of Sprint/Nextel Corporation, the target telephone was a pre-paid cellular telephone serviced by Sprint/Nextel, subscribed to by Saul Gomez at P.O. Box 54988, Irvine, California[1], and had a service activation date of March 24, 2009.  The affidavit and application applied to any changed telephone or UFMI numbers subsequently assigned to the target telephone, and any background conversations intercepted in the vicinity of the target telephone while the telephone or its walkie-talkie feature were activated.

---

[1]This is actually the address of the corporate offices of the Boost Mobile Company, through which the target telephone was purchased.  (Auten Aff. at ¶ 31).

Auten's affidavit explains that mobile phones with a walkie-talkie service are different than other mobile phones. Sprint/Nextel mobile phones with a walkie-talkie service are identified by the same phone number and IMSI number configuration as many other types of mobile phones. However, in addition to the phone number and IMSI number, the walkie-talkie service has a specific number associated with it. When the walkie-talkie service is utilized, the caller must enter the UFMI number and then activate the walkie-talkie service, much the same way as the caller enters the destination phone number on a standard mobile phone. The Sprint/Nextel mobile phone called then displays the UFMI number of the calling phone just as a standard mobile phone would display the mobile phone number of the calling phone if equipped with the caller identification function.

The named interceptees were identified as
- David Hernandez, aka David Moreno, aka Pelon;
- Luis Melchor-Jerbacio, aka Moto, aka Jalisco;
- Luis J. Marin, aka Pelon;
- Francisco Escutia;
- Manuel Hernandez Jr.;
- Ross Loren Pry, aka Guero; and
- "others yet unknown."

David Hernandez had been implicated by one Robert Boyles, who was arrested on August 26, 2008 for delivering methamphetamine to a cooperating individual. Boyles reportedly identified the source of the methamphetamine as David Hernandez of 3936 T Street, Omaha, Nebraska. Boyles said he had received approximately 7.5 ounces of methamphetamine from David Hernandez over time, and David Hernandez routinely used cellular telephone (402) 590-4747 to arrange drug sales. Boyles provided a physical description of David Hernandez and

-4-

a description of the vehicle utilized by David Hernandez.  This information was confirmed by Special Agent Auten.  (Auten Aff. at ¶ 27).  Auten confirmed via telephone records that telephone (402) 590-4747 was in contact with Boyles in 185 calls between August 3, 2008 and the time of Boyles' arrest on August 26, 2008.  Telephone (402) 590-4747 was a prepaid Cricket phone with a fictitious address of 3923 V Street, Omaha, subscribed to by "Angel FELIX." Telephones (402) 590-4747 and (402) 510-6035 (the target telephone) called multiple common numbers, including David Hernandez' mother.

During their investigation, law enforcement learned that David Hernandez  had been arrested in 2007 for receiving stolen property and delivering marijuana, and had registered a vehicle at a fictitious address of 3934 U Street in Omaha.  Surveillance officers observed Hernandez' vehicle, and other vehicles known to be driven by Hernandez at his current address of 3936 T Street.

David Hernandez and Luis Melchor-Jerbacio ("Melchor") contacted each other in order to arrange purchases and transportation of methamphetamine and illicit money.  Calls from telephones used by Melchor and Luis Marin were previously intercepted in the District of Colorado.[2]  These calls included conversations with David Hernandez about collecting illicit drug money, the purchase and delivery of illegal narcotics, and recruiting drug couriers for their

---

[2]On July 24, 2009, AUSA Michele Korver, District of Colorado, received authorization to begin interceptions over telephone number (303) 304-5171 which remained operational until Melchor ceased using that number on or about August 17, 2009.

On September 3, 2009, AUSA Korver received authorization to begin interceptions over telephone number (303) 994-2305, the telephone used by Luis Marin.

On September 25, 2009, AUSA Korver received authorization to begin interceptions over telephone number (303) 350-6133, a telephone used by Melchor.

organization.  The intercepted calls took place while David Hernandez was utilizing the target telephone, with number (402) 510-6035 and UFMI 103*323*8397.

On July 24, 2009, the DEA Colorado Springs Resident Office began its Title III intercept on Melchor's telephone, (303) 304-5171.  During the course of the intercept, Melchor had conversations with a male called only by the name "David," who resided in Omaha and utilized the target telephone.  On August 6, 2009, the investigators verified that David Hernandez was the user of the target telephone, based upon surveillance and the traffic stop of David Hernandez while he was intercepted using the target telephone to speak with Melchor.  (*See* Auten Aff. at ¶¶ 70-73).

Sprint/Nextel records showed that David Hernandez changed the primary number of the target telephone to (402) 504-8583 on September 29, 2009; however, the IMSI and UFMI of the target telephone did not change.  On September 28,2009, a new District of Colorado T-III intercept[3] began on (303) 350-6133 with UFMI 100*507*11169, utilized by Melchor.  After that time, David Hernandez was intercepted using the target telephone in calls with (303) 350-6133 with UFMI 100*507*11169.  The last known intercepted call between the target telephone and Melchor's phone was on October 6, 2009.

Melchor resided at 10225 E. Girard Ave., Apt. F202, Aurora, Colorado.  Intercepted telephone calls indicated that Melchor had multiple conversations with David Hernandez, Francisco Escutia and Luis J. Marin about collecting drug money, the purchase and delivery of

---

[3]*I.e.,* Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520.  A "Title III" or "T-III" is a wiretap.

illegal narcotics, and recruiting drug couriers.  Melchor's communications from (303) 304-5171 were intercepted while David Hernandez was using the target telephone.  Melchor stopped using telephone (303) 304-5171 on August 17, 2009.  Melchor began  using number (303) 350-6133 with UFMI 100*507*11169.  Since August 10, 2009, Dialed Number Recorder (DNR) records show that the target telephone had 131 contacts with Melchor's telephone number (303) 350-6133.

Luis J. Marin resided at 315 E. Delta Road, Tucson, Arizona.  Previously intercepted calls involving Melchor, Marin, and David Hernandez included conversations about collecting illicit drug money, the purchase and delivery of illegal narcotics, and recruiting drug couriers for their organization.  Marin's communications were intercepted in a second Title III intercept while he was using telephone number (303) 994-2305 during conversations with Melchor, who was using telephone number (303) 304-5171.

The investigation revealed that Francisco Escutia had been in contact with Melchor and David Hernandez to arrange purchases and transportation of methamphetamine.  Escutia was being investigated by the Kansas City Interdiction Task Force (KCITF) as a methamphetamine supplier in the Kansas City area.  (Auten Aff. at ¶ 65).  Calls intercepted from Melchor's telephone included conversations between Melchor and Escutia about the purchase and delivery of illegal narcotics.  Surveillance officers observed Escutia meeting with David Hernandez and Ross Loren Pry at 976 S. 73rd Street, Kansas City, Kansas, at the River Oaks Estates Trailer

Park, prior to the seizure of approximately 7 pounds of methamphetamine transported from that location by one Ferid Nadarevic on August 7, 2009.[4]

Manuel Ernesto Hernandez Jr. resided at 2513 S. 9th Street, Omaha, Nebraska, and is the brother of David Hernandez. Multiple calls between Melchor and David Hernandez included mention of Manuel Hernandez accompanying David Hernandez to collect drug proceeds and to picking up drugs on behalf of David Hernandez. (*See, e.g.,* Auten Aff. at ¶¶ 75-80). Apparently, Melchor and Manuel Hernandez traveled to Arizona together in October 2009; however, Manuel Hernandez had to return to Omaha in time for a court appearance set for October 13, 2009. (Auten Aff. at ¶ 80). Telephone subscriber records indicated that Manuel Hernandez used telephone number (402) 505-2277 with UFMI 103*323*8562. Toll records showed that telephone number (402) 505-2277 was in contact with Melchor's telephone (303) 350-6133 and the target telephone utilized by David Hernandez. Auten's affidavit notes that these telephone contacts and the intercepted conversations between Melchor and David Hernandez made it quite possible that Manuel Hernandez could either utilize the target telephone or be intercepted via the target telephone while a Title III intercept is in effect. (Auten Aff. at ¶ 23).

Ross Loren Pry resided at 3934 S Street, Omaha, Nebraska. He was the subject of multiple calls between Melchor and David Hernandez, wherein he was referred to as "Guero," and spoken of as a drug courier. Melchor and David Hernandez specifically referred to Pry's red

---

[4]On August 7, 2009, KCITF surveillance officers observed Nadarevic drive a 1998 Plymouth Voyager minivan to 976 S. 73rd Street, Kansas City, Kansas, where he met with Escutia and other unidentified males. The males loaded packages into a space below Nadarevic's minivan windshield wipers. Nadarevic left in the minivan, drove into Missouri and north in Interstate 29, where he was stopped by the Missouri State Police. Investigators then seized approximately 3.25 kilograms of methamphetamine from a space below Nadarevic's minivan windshield wipers. (Auten Aff. at ¶ 74).

truck when discussing vehicles to use for transporting money and drugs.[5]  On August 6, 2009, surveillance officers observed Pry and David Hernandez traveling to Kansas City, Kansas where they met with Francisco Escutia.  During this surveillance, calls intercepted from Melchor's telephone (303) 304-5171 indicated that Melchor and David Hernandez discussed the purchase and delivery of illegal narcotics from Escutia, particularly descriptions, quality, and price of illicit drugs.  Officers saw David Hernandez and Pry meet Escutia at 976 S. 73rd Street, Kansas City, Kansas, at the River Oaks Estates Trailer Park.  The next day, surveillance officers observed Escutia and unknown associates at the same location, hiding packages in a vehicle driven by Ferid Nadarevic.  These packages were later seized by the Missouri State Patrol and discovered to contain approximately 7 pounds of methamphetamine.

On September 11, 2009, surveillance officers observed Melchor and Marin in the red Chevrolet pick-up truck owned by Pry, traveling from Colorado to David Hernandez' residence at 3936 T Street, Omaha, Nebraska.  Although Ross Pry was not intercepted during Title III intercepts of Melchor's or Marin's telephones, Pry was listed as a "named interceptee" because his vehicle was used to facilitate the trafficking organization, he was seen traveling with David Hernandez during Hernandez' and Escutia's negotiations for controlled substances, and Pry was the topic of multiple intercepted conversations.  Thus, it was possible that Pry could either utilize the target telephone or be intercepted via the target telephone while a Title III intercept was in effect.

---

[5]Pry was the registered owner of a red Chevrolet pickup truck.  Surveillance officers observed the truck being utilized by Melchor and Marin.  (Auten Aff. ¶¶ 41-42).

Analysis of summaries of intercepted telephone calls ("Line Sheets") between Melchor and Marin, and Melchor and David Hernandez indicated that the conversations were conducted in code when they pertained to illegal activities.  If a conversation related to "nonillegal" activities, such as to Melchor's or Hernandez' day-to-day life, the conversation was specific and easily understood.  These parts of conversations were very short in duration.  The majority of conversations then turned to Melchor, Marin, or Hernandez talking about people, items, and locations in a non-concrete way, such as setting the price of "work" or "hours" without mentioning any specific details or names; describing locations as "over there" or "up north" without saying any specific location; and describing items as "paper," "boxes," and "the ones." Based on training and experience, S.A. Auten believed normal conversation between two people talking about legal activities would contain specific names, locations, and items instead of vague terms.

Paragraphs 33 through 80 of Auten's affidavit contain information from several Line Sheets summarizing 22 "coded" telephone conversations intercepted pursuant to the Colorado wiretaps between July 27, 2009 and October 10, 2009, together with law enforcement's interpretation of each conversation.  More than half of the calls relate to the events of August 6-7, 2009 in or near Kansas City, Kansas.  Factual references to Manuel Hernandez appear in paragraphs 23, 75, 76, 77, 78, 79, 80, in conjunction with telephone conversations which occurred between October 4 and October 10, 2009.

### C.    Testimony of Special Agent Auten

Agent Auten testified that, in preparing the application for the wiretap, he reviewed and compiled information from his own records as well as reports from the District of Colorado, the District of Missouri and the District of Southern Iowa. The application was completed, was reviewed by the Department of Justice, and submitted to the issuing judge through the U.S. Attorney's office in this district.

After the wiretap was authorized on October 22, 2009, the persons who were going to monitor the conversations were provided written and verbal instructions on how to handle the Title III wire intercept. The instructions included guidelines and procedures such as how long to listen, what constituted privileged conversations that they could not listen to, how minimization would be effected, and how to spot check calls once a call had been minimized. The monitors were instructed that they were not allowed to listen to any conversation which they could tell was taking place between two persons which shared a legal right to privacy, such as between a clergymen and someone in their church, husband and wife, doctor and patient, or lawyer and client.

The order authorizing the wiretap required minimization "in accordance with Chapter 119 of Title 18, U.S.C." The application itself, at paragraph 86, requested certain procedures for minimization and for Spanish language interpreters or translators. The interpreters attended the minimization meeting and, from the October 23, 2009 through November 21, 2009, were the primary monitors.

Each call monitor acknowledged reading and understanding the written requirements. Agent Auten testified that no privileged calls were recorded during the execution of this wiretap.

To minimize a call, the monitor listens to determine whether one of the named targets of investigation in the order is speaking. If the party on the target telephone is not one of the listed persons, that call may not be listened to, unless in that portion the monitor has already detected evidence of criminal activity. Then, if the speaker is someone the officers are authorized to listen to, the monitor then listens for the relevant conversation to determine whether or not the goals of the wiretap, set forth in the affidavit, are being met. If a conversation is evidence of criminal activity, or if there are persons being identified in that conversation, the call typically will be listened to for one to two minutes. If there is nothing pertinent or relevant to achieving the goals of the wiretap, then the recording is turned off for a period of approximately a minute. The monitor can see from a computer screen if the call is still continuing. For continuing or lengthy calls, the monitor can "spot check" the call by stopping and resuming the recording for approximately 1-minute intervals. If, upon resuming recording, the monitors determine the call is not relevant, they again stop recording and resume after about one minute to determine whether the nature of the call has changed.

In this instance, approximately 40 calls were minimized. Calls were intercepted during the period between October 22, 2009 and November 24, 2009. The recordings were provided to defense counsel through discovery.

This wiretap was sealed, and it was necessary to obtain permission from the court before notifying individuals that their telephone conversations had been intercepted. On November 24,

-12-

2009, the government requested that the recordings be sealed because the investigation of the named subjects, and others, was continuing and notification to the parties whose conversations were intercepted would alert the subjects to the existence and extent of the investigation.  (Ex. 4).  The request was granted, and the notification requirements of 18 U.S.C. § 2518(8)(d) were postponed as to all parties until further order of the court.

On May 11, 2010, the issuing judge authorized disclosure of the intercepted communications.  (Ex. 5).  Defendants/Movants Lomeli and Hernandez were notified  by letter on or about May 28, 2010 that their telephone conversations had been intercepted during this wiretap.  The letters were signed by the DEA's district office special agent in charge and sent by certified mail, return receipt requested, to the home addresses discovered during the investigation.  One receipt, signed by Christian Lomeli, was returned.  The receipt for the article addressed to Manuel Hernandez was not returned; however, the U.S. Post Office website showed that the article had been delivered.

Agent Auten testified that he did not have defendant Lomeli's name as a suspect prior to submitting the wiretap application.  Lomeli's name did come up in the course of conversations intercepted from the target telephone.

**B.    Search Warrant for Lomeli's Residence**

On February 24, 2010, Omaha Police Officer Greg Hamill obtained a search warrant from the Douglas County Court (Exhibit 1) for Carlos Lomeli's residence at 1915 Washington Street in Omaha.  By affidavit, Hamill advised the issuing judge that, within the past 72 hours, he had received reliable information that marijuana was being distributed in the Omaha area by the

occupant of 1915 Washington Street.  A trash pull was conducted from the residence, yielding a green, leafy substance with seeds that field tested positive for marijuana.  Similar residue was found inside four long sections of plastic wrapping material approximately six to eight feet long that were accompanied by numerous smaller sections of the same material. The odor of marijuana was strong on the plastic wrapping.  From experience, Hamill knew that the type, size and odor of the plastic wrapping material found in the trash resembled wrapping used to package large bales of marijuana for transport. A paper note held in one of the long lengths of plastic wrapping contained the writings of "15.30" and "45." Hamill believed this note was used to label an individual bale of marijuana.  The green leafy residue located on the plastic wrappings gave a positive field test result for the presence of marijuana.  The trash contained various items of venue to Carlos Lomeli.

The search warrant was executed on March 4, 2010.  A Return and Inventory was made to the Douglas County Court on March 24, 2010, indicating that the officers seized several ID cards to various suspects, multiple cash transfer receipts, multiple cell phones, a digital scale, a glass marijuana pipe and rolling papers, 7 marijuana plants, a marijuana grow lamp, about 80 grams of marijuana, venue items, and 10 rounds of ammunition.

## II.  LEGAL ANALYSIS

### A.    Issuance of the Nebraska Wiretap on October 22, 2009

Carlos Lomeli and Manuel Hernandez contend (1) the October 22, 2009 court authorization is deficient because the application did not identify the officer authorizing the application, *see* 18 U.S.C. § 2516(1) and 2518(1)(a); (2) the application did not establish

probable cause to believe that the identified telephones were being used in the commission of a crime; (3) the application did not specifically identify Carlos Lomeli as a person whose communications were to be intercepted; (4) the application did not include a full and complete statement as to whether other investigative procedures were tried and failed, were unlikely to succeed, or were too dangerous; (5) the authorities failed to minimize their eavesdropping; and (6) the defendants were not given notice that they were parties to intercepted communications.

Applications for an order authorizing or approving the interception of wire or oral communications ("wiretap applications") must be authorized by "[t]he Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General[.]"  18 U.S.C. § 2516(1).  All wiretap applications must identify the investigative or law enforcement officer making the application, and the officer authorizing the application. 18 U.S.C. § 2518(1)(a).  *See generally* Hon. James Carr & Patricia L. Bellia, 1 Law of Electronic Surveillance § 4:10 (Westlaw, updated Aug. 2010).

In *United States v. Giordano*, 416 U.S. 505, 514 (1974), the Supreme Court determined that the purpose of the Omnibus Crime Control and Safe Streets Act of 1968 was to prohibit all interceptions of oral and wire communications, except those specifically provided for in the Act. Investigative personnel may not ask a judge for authority to wiretap or eavesdrop.  Rather, "[t]he mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order."  416 U.S. at 515-16.  The Court stated it was

"confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." 416 U.S. at 528. "The requirement in 18 U.S.C. § 2518 that the authorizing officer be named was designed to insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command." *United States v. Cox*, 462 F.2d 1293, 1300 (8th Cir. 1972), *cert. denied*, 417 U.S. 918 (1974).

In this instance, the application for the Nebraska Wiretap states only that "an appropriate official of the Criminal Division" had authorized the application. The documents apparently intended to identify this official are not attached to the application (Ex. 2) and have not otherwise been filed with the court.[6] The order authorizing the Nebraska Wiretap states only that the application was "authorized by a duly designated official of the Criminal Division, United States Department of Justice," pursuant to 18 U.S.C. § 2516. Since the necessary documents were completely omitted from the application, the identity of the authorizing official cannot be discerned from the documents filed with the application, and there is no evidence that the issuing judge was presented with the Justice Department's authorization of the Nebraska Wiretap application.

---

[6]In *United States v. Vogt*, 760 F.2d 206 (8th Cir. 1985), the court held that "the purpose of § 2516 clearly can be effectuated by telephonic authorization." In this case, however, there is no evidence that telephonic authorization was procured from the Justice Department prior to presenting the application to the district court.

Under the Act, the court may suppress evidence acquired through eavesdropping, upon motion of "any aggrieved person"[7] if "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a).

The Eighth Circuit has acknowledged that "§ 2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than a technical defect." *United States v. Moore*, 41 F.3d 370 (8th Cir. 1994), *cert. denied*, 514 U.S. 1121 (1995). *See also United States v. Gray*, 521 F.3d 514 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2824 (2009), and *United States v. Fudge*, 2001 WL 34377928 at *5 (W.D. Wis. June 21, 2001), *aff'd*, 325 F.3d 910 (7th Cir. 2003).

In *United States v. Chavez*, 416 U.S. 562 (1974), the companion case to *Giordano*, the Court held that suppression was not necessary where the Attorney General had actually authorized the challenged wiretap, but the application and order incorrectly identified the Assistant Attorney General as the authorizing official. The record must show, however, that a statutorily designated official actually gave the authorization. *United States v. Gray*, 521 F.3d at 526.

---

[7]The term "aggrieved person" is defined in 18 U.S.C. 2519(11) as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." Lomeli and Hernandez are "aggrieved persons" and have standing to challenge the legality of the Nebraska Wiretap.

Suppression is required "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Giordano*, 416 U.S. at 527. A wiretap application that has not been authorized by the Department of Justice cannot support the issuance of a wiretap order. Thus, failure of the application to show that it had been authorized by the Justice Department is not a minor technical defect. *See, e.g., United States v. Staffeldt*, 451 F.3d 578, 579 (2006), *as amended*, 523 F.3d 983 (9th Cir. 2008) (evidence suppressed where memorandum of authorization attached to the application pertained to an entirely unrelated wiretap).

In this case, the documents said to demonstrate that a statutorily designated official actually authorized the Nebraska Wiretap were completely omitted from the application. I find that the application was facially insufficient and recommend that all evidence obtained as the result of the Nebraska Wiretap be suppressed pursuant to 18 U.S.C. § 2518(10)(a)(ii) and *Wong Sun v. United States*, 371 U.S. 471 (1963).[8]

In the alternative, if the district court determines that the government's failure to identify the authorizing official is a technical defect and does not warrant suppression under 18 U.S.C. § 2518(10)(a)(ii), I further find that the application and affidavit demonstrated probable cause that an enumerated crime had been committed, and all other challenged Title III requirements were met.

---

[8]Under the "fruit of the poisonous tree" doctrine, evidence that is obtained by the illegal actions of law enforcement officers must be suppressed. *See, e.g., United States v. Torres-Lona*, 2006 WL 3254538 at *12 (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

### B.   Issuance of the Search Warrant for Lomeli's Residence

Lomeli's motion (Doc. 142) alleges that the application for the February 24, 2010 search warrant "failed to demonstrate circumstances regarding the informant's veracity and how he acquired his information."  Lomeli contends that the warrant was issued based upon information obtained from illegally intercepted communications and that the fruits of any physical searches of his property must be suppressed under *Wong Sun v. United States*, 371 U.S. 471 (1963).

When, as in this case, the issuing judge relied solely upon a supporting affidavit to issue a search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.  *United States v. Solomo*n, 432 F.3d 824, 827 (8th Cir. 2005); *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003), *cert. denied*, 541 U.S. 1081 (2004).  Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Determining whether probable cause exists is a commonsense, practical question to be judged from the totality of the circumstances.  *Id*. at 230.[9]  The duty of this court, as a reviewing court, is simply to "ensure that the magistrate or issuing judge had a 'substantial basis for ... conclud[ing]' that probable cause existed."  *Illinois v. Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  Great deference is afforded the issuing judge's determination of probable cause.  *Illinois v. Gates*, 462 U.S. at 236; *United States*

---

[9]In 1983, the Supreme Court abandoned the "two-pronged test" established in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969).  In its place, the Court "reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations."  *Illinois v. Gates*, 462 U.S. at 238.  Defendant Lomeli's reliance on the *Aguilar/Spinelli* analysis is misplaced.

-19-

*v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010), *petition for cert. filed* Sept. 14, 2010 (No. 10-6476).

Officer Hamill's affidavit (Ex. 1) first advised that, within the past 72 hours, he had received reliable information that marijuana was being distributed in the Omaha area by the occupant of 1915 Washington Street, i.e., Carlos Lomeli.  Considering only the "four corners of the affidavit," the court has no reason to believe that the "reliable information" was supplied by a confidential informant.

The investigating officers corroborated the information that marijuana was being distributed from Lomeli's residence by conducting a trash pull.  "Police may search trash left outside the curtilage of the house to be picked up by garbage collectors, because the owners of the trash have abandoned it."  *United States v. Spotted Elk*, 548 F.3d 641, 653 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1658, 2017 & 2452 (2009) (citing *California v. Greenwood*, 486 U.S. 35, 40-43 (1988), and *United States v. Trice*, 864 F.2d 1421, 1423-24 (8th Cir. 1988)).[10] Evidence from a trash pull, standing alone, can provide sufficient probable cause for issuance of the search warrant.  *See, e.g., United States v. Briscoe*, 317 F.3d 906, 908-09 (8th Cir. 2003); *United States v. Timley*, 443 F.3d 615, 623-24 (8th Cir.), *cert. denied*, 549 U.S. 889 (2006).

---

[10]The affidavit states that the trash pull was conducted "from the residence," but does not reveal the exact location of the trash receptacle.  A defendant who alleges falsity or recklessness in a search warrant affidavit must make a preliminary showing to be entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Failure to indicate in the search warrant application that the trash was seized from a location other than an area in which the items could be deemed abandoned could amount to falsity or recklessness.  Lomeli did not make any preliminary showing that the trash pull was conducted in an improper area and did not raise any *Franks* challenge to the search warrant application.  Consequently, inquiry at the evidentiary hearing was limited to the "four corners" of the document.

Under the totality of the circumstances, and giving due deference to the issuing court, I find the county judge had a substantial basis for concluding there was probable cause to believe that evidence of a crime would be present at Lomeli's residence.

During oral argument, Lomeli speculated that the "reliable information" had to have originated from a telephone conversation intercepted pursuant to the Nebraska Wiretap, since Lomeli's name was mentioned in the course of conversations intercepted from the target telephone. Ergo, had Lomeli's name not been mentioned during an illegally-intercepted telephone conversation, law enforcement would not have investigated his activities. This argument is not persuasive, and I find that evidence seized pursuant to the search warrant should not be suppressed under *Wong Sun v. United States*.

I also find that the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), applies to this search warrant. In *Leon*, the Supreme Court recognized that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. Accordingly, evidence obtained pursuant to a search warrant should not be excluded where the officers executed the warrant "with an objectively reasonable reliance on the magistrate's determination of probable cause." *United States v. Riedesel*, 987 F.2d 1383, 1391 (8th Cir. 1993).

The Court established four exceptions to the good faith exception: (1) when the judicial officer was misled by information in the affidavit that the affiant knew was false or included in the affidavit in reckless disregard of the truth; (2) where the issuing officer wholly abandoned the judicial role; (3) where the affidavit supporting the warrant contains so few indicia of

probable cause as to render official belief in existence of probable cause "entirely unreasonable;" and (4) where the warrant itself was so facially deficient that no executing officer could reasonably presume it to be valid.  *Leon*, 468 U.S. at 923.

The Fourth Amendment exclusionary rule does not ban evidence obtained by an officer acting in reasonable reliance upon a search warrant issued by a neutral magistrate, even if the warrant is later found to be invalid for lack of probable cause.  Here, the officers' reliance on the search warrant was objectively reasonable.  Even if the affidavit in this case did not establish probable cause for the issuance of the search warrant, I find that the evidence is nevertheless admissible under the good faith exception of *Leon*.

## III.  RECOMMENDATION

**IT IS RECOMMENDED** that the motions to suppress evidence (Doc. 142 & Doc. 158) filed by Carlos Lomeli and Manuel Hernandez be granted in part, and denied in part, as follows:

1.    The motions should be granted as to all evidence obtained as the result of the Nebraska Wiretap, pursuant to 18 U.S.C. § 2518(10)(a)(ii) and *Wong Sun v. United States*, 371 U.S. 471 (1963).

2.    The motion to suppress evidence obtained from Lomeli's residence should be denied (a) because the search warrant for Lomeli's residence was not obtained as the result of the Nebraska Wiretap, (b) there was probable cause to issue the warrant, and (c) the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), applies to this search warrant.

A party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation.  The objecting party must comply with all requirements of NECrimR 59.2.

**DATED December 9, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett, III**
**United States Magistrate Judge**